UNITED STATES DISTRICT COURT
WESTERN MASSACHUSETTS DISTRICT

CIVIL ACTION NUMBER: 04-30006-KPN

THOMAS KENNEDY,
PLAINTIFF
V.
COMMONWEALTH OF MASSACHUSETTS COUNTY OF HAMPDEN,
HAMPDEN COUNTY CORRECTIONAL CENTER,
MICHAEL ASHE, JR., SHERIFF OF HAMPDEN COUNTY
THOMAS CONKLIN, SUPERINTENDENT OF HEALTH SERVICES OF
HAMPDEN COUNTY CORRECTIONAL CENTER,
AND CERTAIN JOHN DOES,
DEFENDANTS

### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT.

Now come the defendants in the above-captioned matter, and move for summary judgment pursuant to Federal Rule of Civil Procedure 56 on the grounds that, based upon the record before the court, they are entitled to summary judgment as a matter of law.

### SUMMARY OF PLAINTIFF'S CLAIMS.

Plaintiff Thomas Kennedy claims that the defendants violated his civil rights and are liable for negligence, intentional infliction of emotional distress, and negligent infliction of emotional distress by failing to provide him with proper medical care when he was an inmate at Hampden County Correctional Center. The defendants deny Kennedy's allegations and submit that he cannot support a cause of action under any federal or state law.

### CONCISE STATEMENT OF MATERIAL FACTS

1.  Plaintiff Thomas Kennedy filed the instant action against the defendants on January 8, 2004. *See* Verified Complaint. (App. pp. 1-20)

2. The Hampden County Correctional Center is owned and operated by the Commonwealth of Massachusetts. *See* Defendant's Answers to Plaintiff's Interrogatory number 3. (App. p. 22)

3. Defendant Michael J. Ashe, Jr. is the Sheriff of Hampden County and an employee of the Commonwealth of Massachusetts. *See* Defendants' Answer paragraph 6. (App. p. 32)

4. Defendant Thomas Conklin is an employee of the Commonwealth of Massachusetts. *See* Defendants' Answer paragraph 7. (App. p. 32)

5. Kennedy was incarcerated at the Hampden County Correctional Center (hereinafter "HCCC") between January 4, 2001, and February 15, 2001.

6. On the morning of January 12, 2001, Kennedy informed Correctional Officer Robert Marcelina that "he fell off of his top bunk and injured his hip." *See* Incident Report Form. (App. p. 40). Officer Marcelina immediately called the Health Services Department, and an officer transported Kennedy to the Health Services Department via wheelchair shortly thereafter. *See id.*

7. Kennedy admits that he injured himself when he attempted to exit his bunk when he "jumps" by jumping onto a chair that swivelled from under the desk and the chair moved. *See* Plaintiff's Answers to Interrogatories # 8. (App. p. 44). See photograph of cell. (App. pp. 99 through 103.

8. Upon arriving at the infirmary, Kennedy complained of an "aching" pain and stated

that his level of pain was a six on a scale of one to ten. *See* Health Services notes 1/12/2001 (App. p. 52). A nurse examined him and ordered x-rays to be taken of his left hip. *See id.* She also ordered ibuprofen for him to be administered three times a day through January 18, 2001. *See id.* The nurse also advised Kennedy to abstain from strenuous activity and to remain in the pod and to rest pending the results of the radiology report. *See id.* She also instructed Kenney to sign up for sick call on January 16, 2001, so that he could be reevaluated at that time. *See id.* Additionally, the nurse ordered that Kennedy be given a bottom bunk on the bottom tier of his pod, use of the elevator, and meals in his pod. *See id.* Kennedy expressed his understanding of the nurse's instructions, stating that he would "take it easy." *See id.* (App. p. 53).

9. On January 16, 2001, the Health Services Department received the radiology report, which indicated that a fracture of Kennedy's left hip was not visible on the x-rays, and recommended that additional views of his left and right hips be taken. *See* X-Ray report. (App. p. 54).

10. On January 16, 2001, Kennedy was a "no show" for sick call, even though the nurse had instructed him to report for sick call that day for a follow-up examination of his hip. *See* Health Services Notes. (App. p. 55).

11. On the morning of January 17, 2001, Kennedy was again a "no show" for sick call. *See* Health Services Notes 1/17/2001 (App. p. 56). Later that afternoon he seen and examined by a physician and additional x-ray views of hips were taken.

*See* Health Services Notes 1/17/2001 (App. p. 57). Kennedy was issued crutches, and his elevator pass and the order for his meals to be served in the pod were extended for one month. *See id.*

12. On January 18, 2001, the Health Services Department received the radiology report regarding the second set of x-rays taken the previous day. *See* X-Ray Report. (App. p. 58). The report indicated that the x-ray was "suspicious for a non-displaced non-angulated fracture." As a result of the radiologist's report, Kennedy was transported to the Baystate Medical Center emergency room for further evaluation. *See* Health Services Notes 1/18/2001. (App p. 59) He was admitted with a diagnosis of a fracture in his left hip and scheduled for surgery.

13. During Kennedy's stay at Baystate Medical Center, Health Services Department staff spoke with his attending nurses on several occasions. On January 25, 2001, Lori Hillman, R.N., asked Kennedy's nurse at Baystate to investigate Kennedy's possible need for physical therapy so that she could begin making the necessary arrangements. *See* Health Services Notes 1/25/2001. (App. p. 60)

14. On January 26, 2001, Kennedy was transferred back to HCCC. See Health Services Notes 1/26/2001 (App. p. 61). He was assigned to the bottom bunk of a cell in the lower tier of his pod and continued to receive his meals in the pod. *See id.* Kennedy was instructed to contact the Health Services Department if he experienced any calf pain or tenderness, any numbness or tingling, or if he was unable to do partial weight bearing on his left leg. *See id.*

15. After returning to HCCC, Kennedy was seen regularly by the staff of the Health Services Department for follow-up care of his surgical wound and administration of medication. *See* Health Services Notes. App. pp. 62-69.

16. On February 14, 2001, a nurse and a correctional officer observed Kennedy "walking up and down the stairs carrying his crutches and ambulating without any difficulty" when he went to the Health Services Department for his pain medication. *See* Health Services Notes 2/14/2001. (App. p. 70).

17. A February 5, 2001 medical report from New England Orthopedic Surgeons, Inc. states that Kennedy "has excellent hip range of motion passively and actively." (App. p. 72). The report further states that "X-rays show excellent alignment of his fracture with good pin placement" and that the physician fully expected that Kennedy's hip would be healed in "three months time." *See id.*

18. On February 15, 2001, Kennedy was sentenced to the Hampshire County Jail and House of Correction.

19. A March 23, 2001 medical report states that Kennedy "walk[s] without any assistive devices and even walks on a treadmill at a slow pace." (App. p. 74).

20. A May 17, 2001 medical report states that at a sixteen weeks post-op recheck, Kennedy "has no complaints." (App. p. 73). The report further states that "[e]verything looks quite good," [t]he patient is healing his fx nicely," and "[h]e can resume full, unrestricted activity as tolerated." *See id.*

21. Massachusetts General Law Chapter 258, the Massachusetts Tort Claims Act,

requires that a claimant present the "executive officer" of a public employer sufficient written notice of the claim, and that in the case of the Commonwealth, such written presentment shall be made "to the attorney general." *See* G.L. c. 258, § 4. (App. p. 71).

22. At all times pertinent, the defendants Ashe and Conklin were public employees under the Massachusetts Tort Claims Act, G.L. c. 258. *See* Defendants' Answer paragraphs 6 and 7. (App. p. 32).

23. There are no factual allegations set forth in the plaintiff's Verified Complaint against defendants Ashe or Conklin. *See* Verified Complaint. (App. p. 1-20)

24. On September 25, 2001, Kennedy, through counsel, sent a letter purporting to be a "NOTICE OF LIABILITY - Personal Injury" to William F. Galvin, Secretary of the Commonwealth of Massachusetts; Michael J. Ashe, Jr.; Thomas Conklin; and William Fitzgerald. *See* App. p. 13-15.

25. Kennedy failed to send a presentment notice to the Attorney General of the Commonwealth as required under Massachusetts General Law Chapter 258, § 4.

26. The defendants' Answer sets forth, as affirmative defenses, that as a public employees of the Commonwealth, they are immune from suit for actions committed within the scope of their employment (Thirteenth and Fourteenth Defenses), and that Kennedy has failed to comply with the notice requirements of Chapter 258 (Eighth and Fifteenth Defenses). *See* Defendants' Answer to Complaint. (App. pp. 37-38).

27. Kennedy is not currently under a doctor's care for the injury to his hip. *See* Kennedy Deposition Tr.20-18-20 (App. p. 79).

28. At his deposition, Kennedy offered inconsistent statements regarding the nature of the fracture to his hip, stating first that the hip had "shattered" and later that it had cracked, not shattered. *See* Kennedy Deposition Tr. 46-24 and 83-22-23 (App. p. 86 and 95).

29. At his deposition, Kennedy stated that he had no complaints regarding the correctional officers' treatment of him while he was incarcerated at HCCC. *See* Kennedy Deposition Tr. 45-14-16 (App. p.86 ).

30. At his deposition, Kennedy stated that he did not agree with the decisions made by the medical staff at HCCC regarding his care, and that he "thought they were totally negligent." *See* Kennedy Deposition Tr. 47-9 to 48-5 (App. p. 86).

31. At his deposition, Kennedy admitted that he was fully aware that there was a "lock" that stabilizes the desk stool in his cell at HCCC. *See* Kennedy Deposition Tr. 71-12-19 (App. p. 92).

32. Although the desk stool moves out from under the desk with the lock is not engaged, the actual seat of the stool is stationary and does not spin like a stool. *See* Kennedy Deposition Tr. 79-24 to 80-2 (App. p. 94).

33. At his deposition, Kennedy stated that for some unknown reason, he never got onto the upper bunk by stepping on the end of the lower bunk, and instead used the stool, because he had watched the other inmates accessing the upper bunks

and they did not use the lower bunk as a step, and therefore he "[j]ust didn't do it." *See* Kennedy Deposition Tr. 77-5-17 (App. p. 94).

34. At his deposition, Kennedy claimed without explanation that it was not possible to access the upper bunk by simply stepping on the lower bunk. *See* Kennedy Deposition Tr. 73-4-8 (App. p. 93).

35. At his deposition, Kennedy could not recall asking his cellmate to switch bunks with him prior to his fall, even though Kennedy desired a lower bunk due to sciatica. *See* Kennedy Deposition Tr. 39-5-7 (App. p. 84).

36. At his deposition, Kennedy stated that he had no complaints about either the medical staff or correctional staff after he returned to HCCC from Baystate Hospital. *See* Kennedy Deposition Tr. 51-1-12 (App. p. 87).

37. At his deposition, Kennedy stated that his complaint "is that [he] was hurt and not taken care of in a timely fashion." *See* Kennedy Deposition Tr. 72-10-11 (App. p. 92).

## SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate where, after drawing all reasonable inferences in favor of the non-moving party, there is no genuine issue of material fact for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Pagano v. Frank*, 983 F.2d 343, 347 (1st Cir. 1993). A fact is material if, based upon the substantive law at issue, it might affect the outcome of the case. *See Anderson*, 477 U.S. at 248; *Mack*

*v. Great Atl. and Pac. Tea Co., Inc.*, 871 F.2d 179, 181 (1st Cir. 1989). A material issue is "genuine" if there is sufficient evidence to permit a reasonable trier of fact to resolve the issue in the non-moving party's favor. *See Anderson*, 477 U.S. at 248; *Boston Athletic Ass'n v. Sullivan*, 867 F.2d 22, 24 (1st Cir. 1989).

### ARGUMENT

**1. KENNEDY'S TORT CLAIMS ARE BARRED DUE TO HIS FAILURE TO PROVIDE PROPER NOTICE TO THE ATTORNEY GENERAL AS REQUIRED UNDER THE MASSACHUSETTS TORT CLAIMS ACT, GENERAL LAW CHAPTER 258.**

In Counts III, IV, and V of the Verified Complaint, Kennedy alleges that he was injured by the defendants' intentional infliction of emotional distress, negligent infliction of emotional distress, and negligence. Tort claims against public employees such as those alleged by Kennedy are actionable under the Massachusetts Tort Claims Act. *See* G.L. c. 258; *see also Cook v. Bissonnette*, 1998 WL1181768, *3 (Mass. Super. 1998) (attached) (holding that a prisoner's "claim under 42 U.S.C. § 1983 for a civil rights violation arising out of the negligent handling of his personal property" was estopped because "his exclusive remedy [wa]s a claim under the Massachusetts Tort Claim Act"). As Kennedy "did not claim that the state statutory procedures were inadequate, his exclusive remedy is a claim under the Massachusetts Tort Claim Act." Cook, 1998 WL1181768 at *3. The Act provides that "[p]ublic employers shall be liable for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any public employee while acting within the scope of his office or employment,

in the same manner and to the same extent as a private individual under like circumstances." G.L. C. 258, § 2.

In order to assert a claim under the Act, a plaintiff must make a written presentment to the executive officer of the public employer. Specifically, "[a] civil action shall not be instituted against a public employer on a claim of damages under this chapter unless the claimant shall have first presented his claim in writing to the executive officer of such public employer within two years after the date upon which the cause of action arose . . . ." G.L. c. 258, § 4. The Supreme Judicial Court has held that the requirement set forth in Chapter 258, section 4, that a claimant must present a claim in writing to the executive officer of the employer before instituting a civil action in tort against a public employer, is "a statutory condition precedent for recovery". *Vasys v. Metro. Dist.*, 387 Mass. 51, 55, 438 N.E.2d 836, 839-40 (1982). Here, Kennedy injured himself on January 12, 2001; thus, in order to pursue tort claims against the defendants, he was required to provide proper notice to the appropriate official within two years of that date (i.e., January 12, 2003). He failed to do so.

The presentment requirement has been applied strictly in Massachusetts. *See Fearon v. Commonwealth*, 394 Mass. 50, 52, 474 N.E.2d 162, 164 (1985); *George v. Town of Saugus*, 394 Mass. 40, 42, 474 N.E.2d 169, 171 (1985); *Holahan v. City of Medford*, 394 Mass. 186, 188-190, 474 N.E.2d 1117, 1118-19 (1985); *Weaver v. Commonwealth*, 387 Mass. 43, 47-50, 438 N.E.2d 831, 834-36 (1982). Underlying that strict, and often harsh, interpretation of the presentment requirement is a recognition

of the need for public bodies to make prompt investigations in the interest of disproving fraudulent claims and settling meritorious ones out of court, and the desirability of enabling them to take preventive steps to avoid future claims. The presentment requirement ensures that the responsible public official receives notice of the claim "so that the official can investigate to determine whether or not a claim is valid, preclude payment of inflated or non-meritorious claims, settle valid claims expeditiously, and take steps to insure that similar claims will not be brought in the future." *Lodge v. Dist. Attorney for Suffolk*, 21 Mass. App. Ct. 277, 283, 486 N.E.2d 764, 768 (1985).

Notice to a Sheriff is <u>not</u> sufficient under G.L. c. 258 §4. In *Baptiste v. Sheriff of Bristol County*, 35 Mass. App. Ct. 119, 126, 617 N.E.2d 641, 645 (1993), the trial court's dismissal on summary judgment of the plaintiff's claim of negligence against the sheriff was affirmed on appeal. The Court of Appeals held that the plaintiff's failure "to comply with the requirements of G.L. c. 258, § 4, and present her claims to the [sheriff's] employer" precluded recovery for negligence. Specifically, the court found that "[p]resentment was required by G.L. c. 258, § 1, to be made upon the county commissioners of Bristol County. The plaintiff's presentment letter, dated November 15, 1983, was directed to the defendant sheriff of Bristol County, David Nelson," and thus, did not satisfy the statutory requirements for a proper presentment. <u>Id</u>. Likewise, the Kennedy's failure to direct his presentment letter to the appropriate executive officer bars the instant action against the defendants.

As a result of the legislature's abolition of Hampden county government in 1997,

11

defendants Ashe and Conklin are employees of, and HCCC is owned and operated by, the Commonwealth of Massachusetts. Consequently, the appropriate executive officer for purposes of presentment of Chapter 258 claims is the Attorney General of the Commonwealth. Clearly, the letter sent to the Secretary of the Commonwealth, William Fitzgerald, and defendants Ashe and Conklin on September 25, 2001, did not satisfy the statutory requirement. *See* G.L. c. 258, § 4. As it is well established that constructive notice is not sufficient to satisfy the presentment requirement, the letter directed to the aforementioned individuals failed to satisfy the statutory notice requirement for filing suit under G.L. c. 258 that notice must be given to the Attorney General. *See Robinson v. Commonwealth*, 32 Mass. App. Ct. 6, 10, 584 N.E.2d 636, 638 (1992) (holding that actual presentment must be made to the appropriate executive officer). As such, the purported presentment letter from Kennedy's attorney must be disregarded for its failure to comply with G.L. c. 258, section 4, and the plaintiff's claims are barred due to his failure to make a proper presentment to the Attorney General.

### 2. PUBLIC EMPLOYEE DEFENDANTS ASHE AND CONKLIN ARE IMMUNE FROM LIABILITY FOR TORT CLAIMS UNDER G.L. CHAPTER 258.

As public employees, defendants Ashe and Conklin enjoy statutory immunity for any alleged acts of negligence committed within the scope of their employment with the Commonwealth under the Massachusetts Tort Claims Act. *See* G.L. c. 258, § 2 (public employees acting within the scope of their employment are immune from suits arising from the employee's allegedly negligent or wrongful acts or omissions); *Pruner v. Clerk of*

12